1  MICHAEL F. HEAFEY (State Bar No. 153499)
   mheafey@kslaw.com
2  GEORGE R. MORRIS (State Bar No. 249930)
   gmorris@kslaw.com
3  King & Spalding LLP
   601 S. California Street
4  Palo Alto, CA 94304
   Telephone: 1 650 422 6700
5  Facsimile:  1 650 422 6800
6
7  GRANT D. FAIRBAIRN (admitted *pro hac vice*)
   gfairbairn@fredlaw.com
8  Fredrikson Byron, P.A.
   200 South Sixth Street
9  Suite 4000
   Minneapolis, MN 55402-1425
10 Telephone: 1 612 492 7000
   Facsimile: 1 612 492 7077
11
12 Attorneys for Defendant
   ANSER INNOVATION LLC
13

14

15                    UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                     SAN FRANCISCO DIVISION

18
   PETZILLA, INC. a Delaware Corporation,  d/b/a          Case No.  3:14-cv-01354-EMC
19 Petzila
                                                          **DEFENDANT ANSER INNOVATION
20          Plaintiff,                                    LLC'S REPLY MEMORANDUM IN
                                                          SUPPORT OF ITS MOTION
21      v.                                                PURSUANT TO RULE 12(b)(2) TO
                                                          DISMISS FOR LACK OF PERSONAL
22 ANSER INNOVATION LLC, a Minnesota                      JURISDICTION**
   limited liability company,
23                                                        Hearing Date:  August 28, 2014
24          Defendant.                                    Hearing Time:  1:30 p.m.
                                                          Courtroom 5 on the 17th Floor of the
25                                                        San Francisco Courthouse
                                                          Judge: Honorable Edward M. Chen
26                                                        Trial Date: None set
27

28 DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
   OF ITS MOTION PURSUANT TO RULE 12(B)(2) TO DISMISS
   FOR LACK OF PERSONAL JURISDICTION                                    CASE NO. 3:14-CV-01354-EMC

1

**INTRODUCTION**

2         Petzilla, Inc. ("Petzilla") does not argue that the Court has general personal jurisdiction

3    over Anser Innovation LLC ("Anser").  (Dkt. No. 45 at 1, 7-8.)  Rather, Petzilla asserts that the

4    Court should exercise specific jurisdiction over Anser based on events allegedly "related to" this

5    lawsuit.  (*Id.*)  Petzilla's argument fails because Anser has not engaged in sufficient activities in

6    California "relating to the validity and enforceability" of U.S. Patent No. 7,878,152 (the "'152

7    patent") to give rise to specific jurisdiction.  Despite taking jurisdictional discovery, Petzilla

8    presents no evidence that Anser granted anyone an exclusive license to the '152 patent or entered

9    into an exclusive agreement relating to Anser's patented PetChatz product.

10        Petzilla attempts to overcome this lack of evidence by changing its approach.  It now

11   asserts that Anser granted a third-party some exclusive rights relating to a ***second*** product.  This

12   argument also fails, because this new product does not practice any claim of the '152 patent.

13        Anser's only licensing or enforcement activities in California relating to the '152 patent

14   were its cease-and-desist letters to Petzilla, and those letters are legally insufficient to establish

15   specific jurisdiction.  Thus, Petzilla has failed to carry its burden of proof, and the Court must

16   dismiss the First Amended Complaint ("FAC") for lack of personal jurisdiction.

17                                         **ARGUMENT**

18   I.    **PETZILLA MUST PROVE, BY A PREPONDERENCE OF THE EVIDENCE,
           THAT ANSER ENGAGED IN ENFORCEMENT OR DEFENSE EFFORTS IN**
19         **CALIFORNIA RELATING TO THE '152 PATENT**

20         **A.    The Proper Standard Of Proof Is A Preponderance Of The Evidence**

21         As the plaintiff, Petzilla bears the burden of demonstrating jurisdiction.  *Avocent*

22   *Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1330 (Fed. Cir. 2008).  To initially survive a

23   motion to dismiss without the opportunity for discovery, a plaintiff need only make a *prima facie*

24   showing that jurisdiction exists.  *Id.* at 1328.  Once a plaintiff has been afforded the opportunity

25   to conduct jurisdictional discovery, however, the burden is higher.  The plaintiff must

26   demonstrate jurisdiction by a preponderance of the evidence.  *See Pieczenik v. Dyax Corp.*, 265

27

28                                              1

1   F.3d 1329, 1334 (Fed. Cir. 2001); *Monolithic Power Sys., Inc. v. Silergy Corp.*, 2011 U.S. Dist.

2   LEXIS 66096 at \*7-8 (C.D. Cal. June 20, 2011) (Snyder, J.)

3        The Court allowed Petzilla to take jurisdictional discovery on specific jurisdiction.  (Dkt.

4   No. 28; Dkt. No. 46 at 4-6.)  Petzilla propounded 20 document requests, and Anser produced

5   responsive documents.  (Dkt. Nos. 34-3; Dkt. No. 34 at 8-10.)  The Court also gave Petzilla two

6   opportunities to depose Lisa Lavin, Anser's CEO.  (Dkt. No. 28 at 4; Dkt. No. 40 at 2.)  Petzilla

7   declined to do so.  Accordingly, because Petzilla had every opportunity to take discovery on

8   specific jurisdiction, the appropriate burden of proof is a preponderance of the evidence.

9        **B.**     **Petzilla Failed To Present Evidence That Anser Engaged In "Other**
            **Activities" Related To The '152 Patent And Therefore Failed To Establish**
10           **Specific Jurisdiction**

11       Anser's infringement letters alone are insufficient to establish jurisdiction.  *Red Wing*

12  *Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998).  There needs to

13  be "other patent enforcement actions," beyond letters, to support the exercise of specific

14  jurisdiction over Anser.  *Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 789 (Fed. Cir. 2011).

15  In declaratory judgment actions, "only those activities of the patentee that relate to the

16  enforcement or defense of the patent-in-suit can give rise to specific personal jurisdiction for

17  such an action."  *Id.*; *Autogenomics, Inc. v. Oxford Gene Tech, Ltd.*, 566 F.3d 1012, 1020 (Fed.

18  Cir. 2009) (holding that "only enforcement or defense efforts related to the patent rather than the

19  patentee's own commercialization efforts are to be considered for establishing specific personal

20  jurisdiction in a declaratory judgment action against the patentee.").  The mere sale of the

21  patentee's products in the forum – whether covered by the patent-in-suit or not – is not sufficient

22  to establish specific jurisdiction in a declaratory judgment suit.  *Avocent*, 552 F.3d at 1338.

23       In *Autogenomics*, the Federal Circuit gave examples of "other activities" that may qualify

24  as enforcement or defense efforts related to a patent-in-suit.  566 F.3d at 1019-20.  For example,

25  an exclusive license to the patent-in-suit may be sufficient. *Id.* at 1019 (citing *Breckenridge*

26  *Pharm., Inc. v. Metabolite Labs, Inc.*, 444 F.3d 1356, 1366-67 (Fed. Cir. 2006) and *Akro Corp. v.*

27  *Luker*, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) as determining that granting an exclusive license

28                                          2

1   to an entity doing business in the forum state is sufficient extra activity to establish jurisdiction);

2   *see also Avocent*, 552 F.3d at 1335 (noting that "exclusive licensing agreements" reflect the kind

3   of "other activities" that support specific jurisdiction).  Likewise, an exclusive agreement with a

4   third-party that is analogous to an exclusive patent license may be sufficient.  *Autogenomics*, 566

5   F.3d at 1019 (citing *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (Fed.

6   Cir. 1997) as holding that specific jurisdiction existed over a patentee that "contracted with [an

7   exclusive distributor] to sell [the] patented products in [the forum State]" where the agreement

8   was "analogous to a grant of a patent license").  In *Genetic Implant*, the patentee appointed a

9   third-party to be its "exclusive worldwide distributor" of products covered by the patent-in-suit

10  and agreed not to appoint "any other person, firm or entity to sell or otherwise distribute" the

11  patented products.  123 F.3d at 1458-59.

12          Conversely, non-exclusive agreements or licenses do not give rise to jurisdiction.  For

13  example, the *Red Wing Shoe* Court found no specific jurisdiction existed over a patentee that

14  granted non-exclusive licensees to 34 companies, even though the licensees sold patented

15  products in the forum.  148 F.3d at 1359.  In addition, the *Autogenomics* Court affirmed the

16  Central District of California's dismissal for lack of personal jurisdiction, despite the fact that the

17  patentee had non-exclusive licenses with "about ten" California companies.  566 F.3d at 1015,

18  1021.  Finally, the *Avocent* Court determined that no specific jurisdiction existed over a patentee

19  that sold a patented product into the forum through retailers and distributors, because there was

20  no exclusive agreement between the patentee and those third-parties or any other obligation

21  imposed on the patentee to enforce the patent against infringers.  552 F.3d at 1327, 1338.

22          The patent-in-suit in this case is the '152 patent.  (Dkt. No. 12.)  Anser admits that the

23  PetChatz product is covered by claim 1 of the '152 patent.  (*Id.*)  Thus, Petzilla must prove, by a

24  preponderance of the evidence, that Anser either granted an exclusive license to the '152 patent

25  or entered into an exclusive agreement relating to the PetChatz product that bore the earmarks of

26  an exclusive license.  Petzilla failed on both counts.

27

28
                                3

1  **II.     PETZILLA PRESENTED NO EVIDENCE OF A LICENSE AGREEMENT**

2          Petzilla apparently does not contend that Anser granted a formal patent license for the

3  '152 patent to any third-party.  (*See* Dkt. No. 46 at 9-14.)  In fact, the only agreement Petzilla

4  cites is a "Commercialization Agreement" between Anser and Tuffy's Pet Foods, Inc.

5  ("Tuffy's").  (Dkt. No. 41-9.)

6          The Commercialization Agreement itself shows that Anser did not expressly grant

7  Tuffy's an exclusive license to the '152 patent.  Section 7.1(a), entitled "Anser's Ownership

8  Rights," states as follows:

9          ***All intellectual property rights held by Anser prior to the date of this Agreement***
           or developed solely by Anser during the Term of this Agreement will be and
10         ***remain the exclusive property of Anser***.  Tuffy's agrees not to question, dispute
           or challenge the validity of Anser's intellectual property or the exclusive
11         ownership of such intellectual property by Anser.  ***Nothing in this Agreement***,
           nor any act or failure to act by Anser, ***will give Tuffy's any proprietary or***
12         ***ownership interest of any kind in the intellectual property of Anser*** or in the
13         goodwill associated with such intellectual property.

14 (*Id.* (emphasis added))

15         Tuffy's and Anser executed the Commercialization Agreement in October 2011.  (*Id.*)

16 By that time, Anser owned the '152 patent by assignment from the Kroll Family Trust.  (Dkt.

17 No. 12-3 (last page).)  Thus, the Commercialization Agreement confirms that Anser did not grant

18 Tuffy's any "proprietary or ownership interest of any kind" in the '152 patent.  (*Id.*)  Where

19 Anser intended to grant Tuffy's a license, Anser explicitly stated as much.  For example, in

20 Section 7.3(a), Anser granted Tuffy's a ***non-exclusive*** license to certain non-patent intellectual

21 property.  (Dkt. No. 41-9.)

22         Despite relying on the Commercialization Agreement to claim that a license agreement

23 exists, Petzilla points to no evidence therein of an explicit license relating to the '152 patent,

24 much less an exclusive one.  In the absence of a written license agreement, Petzilla thus needed

25 to present evidence of some other arrangement that was analogous to an exclusive patent license,

26 such as an exclusive distribution or retail agreement to sell a patented product in California.  *See*

27 *Genetic Implant*, 123 F.3d at 1458.  As demonstrated below, Petzilla failed on that front as well.

28                                                            4

1

### III. PETZILLA PRESENTED NO EVIDENCE OF AN EXCLUSIVE AGREEMENT RELATED TO THE PATENTED PETCHATZ PRODUCT

2      Anser's PetChatz product is capable of performing the method in claim 1 of the '152

3  patent, making it a patented product. (*See* Dkt No. 12, ¶ 14.) Under the *Autogenomics / Genetic*

4  *Implant* line of cases, an agreement granting a third-party the exclusive right to make, use, or sell

5  the PetChatz product could arguably give rise to specific jurisdiction. Petzilla does not, however,

6  attempt to argue that Anser entered into any such an agreement for the PetChatz product. This is

7  likely because Section 2 of the Commercialization Agreement, entitled "Sale of PetChatz

8  Device," shows that Anser granted Tuffy's no exclusive rights to that product.

9      Section 2 explains that Tuffy's is to provide "reasonable assistance" to Anser in

10  "promoting sales of the [PetChatz] Device." (Dkt. No. 41-9 at Section 2.1.) Tuffy's can provide

11  this assistance by "introducing Anser to relevant distributors, brokers and retailers" and

12  "providing Device sales leads to Anser." (*Id.* at Sections 2.1(d)-(e).) The Commercialization

13  Agreement makes clear, however, that: "Anser will have primary responsibility for sales of the

14  Device" (*Id.* at Section 2.1(a)); "all orders for the Device will be directed to Anser and will be

15  subject to acceptance by Anser" (*Id.* at Section 2.3); "Anser will ship the Device" (*Id.*); "Anser

16  will receive and retain all revenues from sales of the Device" (*Id.* at Section 2.4); "Tuffy's will

17  not participate in revenues from sales of the Device," (*Id.*); and "no commissions will be payable

18  to Tuffy's or its internal sales force with respect to sales of the Device." (*Id.*)

19      As these provisions show, Tuffy's did not receive any exclusive distribution or retail

20  rights relating to the PetChatz product. Rather, Anser and Tuffy's agreed that Anser would offer

21  and sell the PetChatz device through "multiple channels," including "sales to distributors,

22  brokers and retailers *selected by Anser*." (*Id.* at Section 2.1(a) (emphasis added).) Anser's

23  ability to choose a distributor other than Tuffy's to sell PetChatz is antithetical to any claim that

24  Anser granted Tuffy's the *exclusive* right to distribute the PetChatz product.

25      Contrary to Petzilla's assertion, Ms. Lavin accurately described this relationship in her

26  declaration. (Dkt. No. 14-5, ¶ 14.) Section 2 shows that while Tuffy's is Anser's marketing

27  partner for PetChatz, Tuffy's has no exclusive rights relating to the product. Without an

28

5

1  exclusive agreement relating to the PetChatz product, Anser's efforts to market and sell PetChatz

2  in California simply have no bearing on specific jurisdiction.  *See Avocent*, 552 F.3d at 1327,

3  1338 (rejecting the argument that the patentee's sales of patented products into the forum state

4  through non-exclusive distributors or retailers is sufficient to support specific jurisdiction

5  because "the mere sale of defendant's products – whether covered by the patents in suit or not –

6  is not sufficient to establish specific personal jurisdiction in a declaratory judgment suit.").

7       In sum, Petzilla presented no evidence that Anser entered into an express license to the

8  '152 patent or an implied license to the patent through an agreement relating to the PetChatz

9  product.  Thus, Petzilla failed to carry its burden of demonstrating that Anser engaged in "other

10  activities" relevant to the specific jurisdiction inquiry.

11  **IV.   TUFFY'S DOES NOT HAVE EXCLUSIVE RIGHTS TO ANY PRODUCT
12        COVERED BY THE '152 PATENT**

13       Faced with the lack of evidence of an exclusive agreement relating to the PetChatz

14  product, Petzilla now contends that the '152 patent covers a ***second*** product.  Specifically,

15  Petzilla argues that the "Treat Pack" product described in the Commercialization Agreement is

16  an additional "patented product," along with the PetChatz product.  (Dkt. No. 46 at 9-12.)  In

17  order for this approach to succeed, Petzilla must establish that:

18       (1)    At least one claim of the '152 patent covers the Treat Pack; and

19       (2)    Anser granted Tuffy's sufficient rights relating to the Treat Pack such that the

20            Commercialization Agreement is akin to an exclusive license to that claim.

21       Petzilla failed to establish either factor.  First, the Treat Pack is not a patented product.  It

22  does not fulfill the limitations of any claim in the '152 patent.  Second, the Commercialization

23  Agreement does not provide Tuffy's with any exclusive rights relative to the '152 patent.

24       **A.    The Treat Pack Is Not "Patented" Under The '152 Patent**

25       In order for "other activities" to be relevant to specific jurisdiction, they must "in some

26  identifiable way 'relate to' enforcement" of the patent-in-suit.  *Avocent*, 552 F.3d at 1334.  The

27  '152 patent is the only patent Petzilla challenged in its FAC.  (Dkt. No. 12.)  It does not matter

28                                    6

1   for specific jurisdiction purposes whether Tuffy's has an exclusive right to distribute a product

2   that is **not** covered by the '152 patent, because that exclusivity would not relate in any

3   identifiable way to enforcement of the '152 patent.  Perhaps realizing this, Petzilla asserts that

4   the Treat Pack product is covered by claim 11 of the '152 patent.  (Dkt. No. 46 at 9-12.)

5          Claim 11, however, does not support Petzilla's theory.  First, claim 11 is a dependent

6   claim.  (Dkt. No. 46 at 10.)  Dependent claims include every limitation of the independent claim

7   from which they depend.  35 U.S.C. § 112, ¶ 4 ("A claim in dependent form shall be construed to

8   incorporate by reference all the limitations of the claim to which it refers").  Second, claim 11

9   refers to claim 8, an independent claim.  (Dkt. No. 12-3 at claims 8 and 11.)  As a result, claim

10  11 includes not only the limitation added in that claim, but all of the limitations contained in

11  claim 8.  Reading claim 8 and 11 together reveals that Petzilla's license argument is untenable:

12         *8.  A method for communicating with an animal comprising*:

13         *providing a communications device*, *the communications device comprising a housing,*
           *the housing having therein:*

14             *a power supply;*

15             *a microcontroller;*

16             *a speaker;*

17             *a camera;*

               *telecommunications circuitry; and*

18             *a food dispenser;*

19         *the power supply, speaker, camera, telecommunications circuitry and food dispenser*
           *being in communication with the microcontroller;*

20

21         *providing a paw switch attached to the communications device;*

           *the animal depressing the paw switch;*

22         *the communications device initiating an outgoing call to a person;*

23         *the communications device establishing a communications link between the animal and*
           *the person via the telecommunications circuitry; and*

24

25         *the person and animal communicating in real-time via the telecommunications circuitry*
           *and speaker.*

26         *11. The method of claim 8 further comprising dispensing food to the animal.*

27  (*Id.* (emphasis added).)

28                                                   7

1    Petzilla focuses on the "dispensing food to the animal" language and ignores the other 13

2   limitations in claim 11.  This, however, is not the proper analysis.  In order to practice claim 11,

3   Tuffy's would need to do more than sell a Treat Pack.  It would need to practice a method for

4   "communicating with an animal" by providing a "communications device" that contained,

5   among other things, "a power supply," "a microcontroller," and "a camera."  (*Id.*)  The Treat

6   Pack does none of these things.  In fact, it does not perform ***any*** of the 13 limitations in claim 8.

7    Petzilla further contends that Anser granted Tuffy's an implied license to practice claim

8   11.  But if Tuffy's and Anser had not entered into the Commercial Agreement, Tuffy's would

9   still be able to make and sell a treat pack product without infringing claim 11.  That is, Tuffy's

10   would not need a license to the '152 patent, and Anser would not be able to use the patent to stop

11   Tuffy's from selling treat packs.  Since Tuffy's did not need a license to the '152 patent to make

12   or sell treat packs, it is illogical to suggest that Anser granted Tuffy's an implied license to do so.

13    Petzilla endeavors to avoid this dilemma by noting that the Treat Pack is designed for use

14   in the PetChatz device and Anser sometimes offers the products together.  (Dkt. No. 46 at 10)

15   While true, these facts do not help Petzilla.  Claim 8 requires that the communications device

16   include "a paw switch attached to the communications device" so that the animal can initiate a

17   call to the pet's owner.  But PetChatz mounts on the wall and has no "paw switch," as

18   demonstrated by the image below.  Thus, it does not practice claim 8.

19

20

21

22



23

24

25

26

27

28                                                 8

1          If Anser does not practice claim 8, and Anser and Tuffy's together do not practice claim

2   11, there was no need for Anser to grant an implied exclusive license to claim 11 to Tuffy's in

3   the Commercialization Agreement.  The Treat Pack is not a patented product.  As such, Petzilla's

4   arguments about the amount of exclusivity granted to Tuffy's relating to the Treat Pack do not

5   relate in any identifiable way to enforcement of the '152 patent.

6          **B.      The Commercialization Agreement Is Not Exclusive With Respect To The**
7          **'152 Patent Because Anser Cannot Exclude Others From Making Treats**

8          Even assuming, *arguendo*, that the Treat Pack somehow met every limitation of claim 11,

9   the Commercialization Agreement does not grant Tuffy's any exclusivity relative to other pet

10  food manufacturers.  At most, Anser granted Tuffy's the exclusive right to manufacture the pet

11  food products that go into the jointly-developed Treat Packs and the exclusive right to distribute

12  the Treat Packs through certain channels.  (Dkt. No. 41-9 at Section 5(d).)  Anser did not grant

13  Tuffy's the right to make, use, or sell the *only* treats that can be used with the PetChatz product.

14         As shown above, any manufacturer could make a treat pack for use in the PetChatz

15  product without infringing claim 11, so long as they do not also provide the "communications

16  device" required by claim 8.  Anser would not be able to enforce claim 11 against a rival

17  company or use the '152 patent to stop the sale of competing pet treat packs, even if the rival's

18  treat packs were indistinguishable from the Treat Pack product.  Anser and Tuffy's were able to

19  agree to exclusivity between *themselves* regarding the Treat Pack they developed, but Anser has

20  no ability under the '152 patent to exclude *others* from making or selling an identical treat pack.

21         Given this limitation, it is not surprising that the Commercialization Agreement is silent

22  regarding the enforcement of patent rights.  There is no obligation on Anser to enforce the '152

23  patent against competing pet food manufacturers if they develop treat packs for use in the

24  PetChatz device.  (*See id.*)  Nor does the Commercialization Agreement give Tuffy's any right to

25  enforce the '152 patent against others or demand that Anser enforce the patent.  (*See id.*)

26  Without providing Tuffy's any ability to enforce (or request that Anser enforce) the '152 patent

27  against infringers, the Commercialization Agreement is not analogous to an exclusive license.

28                                                  9

**CONCLUSION**

Petzilla failed to present any evidence that Anser entered into an exclusive license for the '152 patent or an exclusive agreement relating to the patented PetChatz product.  Petzilla's attempt to argue, for the first time, that the Treat Pack is patented under the '152 patent fails because the Treat Pack does not practice 13 of the 14 limitations in claim 11.  Tuffy's has no right to enforce the '152 patent itself or require Anser to enforce the patent against others.  Thus, the Commercialization Agreement provides Tuffy's no exclusive rights whatsoever regarding the '152 patent.

Even with the benefit of jurisdictional discovery, Petzilla failed to carry its burden of proving that Anser engaged in other licensing or enforcement activities in California beyond sending letters to Petzilla.  Accordingly, Petzilla simply has no arguments to establish jurisdiction over Anser.  Therefore, the Court must dismiss the FAC for lack of specific personal jurisdiction.

DATED: August 18, 2014

Respectfully submitted,

By:   */s/ George R. Morris*

MICHAEL F. HEAFEY (State Bar No. 153499)
mheafy@kslaw.com
GEORGE R. MORRIS (State Bar No. 249930)
gmorris@kslaw.com
King & Spalding LLP
601 S. California Street
Palo Alto, CA 94304
Telephone: 1 650 422 6700
Facsimile:  1 650 422 6800

///

///

///

///

(Attorneys for Defendant cont'd next page)

10

DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION PURSUANT TO RULE 12(b)(2) TO DISMISS
FOR LACK OF PERSONAL JURISDICTION                                    CASE NO. 3:14-CV-01354-EMC

1

2
GRANT D. FAIRBAIRN
(admitted *pro hac vice*)

3
gfairbairn@fredlaw.com
Fredrikson & Byron, P.A.

4
200 South 6th Street, Suite 4000
Minneapolis, MN 55402

5
Telephone: 612.492.7255
Facsimile:  612.492.7077

6

7
Attorneys for Defendant
ANSER INNOVATION LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
11

1

## CERTIFICATE OF SERVICE

2       I certify that on this date, I filed the foregoing **Defendant Anser Innovation LLC's**

3   **Reply Memorandum in Support of Its Motion Pursuant to Rule 12(b)(2) to Dismiss for**

4   **Lack of Personal Jurisdiction** with the Clerk of Court using the CM/ECF system, which will

5   automatically send an email notification of such filing to the following attorneys of record and to

6   all the registered participants as identified on the Notice of Electronic Filing (NEF) on August

7   18, 2014.

8

9   *Attorneys for Plaintiffs:*

10  NICOLAS S. GIKKAS (SBN 189452)
    THE GIKKAS LAW FIRM
11  530 Lytton Avenue
12  2nd Floor
    Palo Alto, California 94301
13  Phone: (650) 617-3419
    Facsimile: (650) 618-2600
14  Email: nsg@gikkaslaw.com

15
    KIEUN SUNG-IKEGAMI (SBN 211762)
16  INNOVATION COUNSEL LLP
    2880 Lakeside Drive
17  Suite 200
    Santa Clara, California 95054
18  Phone: (408) 331-1670
    Facsimile: (408) 638-0326
19  Email: jsung@innovationcounsel.com

20
    JON Y. IKEGAMI (SBN 211766)
21  COOLEY GODWARD LLP
    Five Palo Alto Square
22  3000 El Camino Real
    Palo Alto, CA 94306
23  Phone: (650) 843-5849
24  Facsimile: (650) 857-0663
    jikegami@beyerlaw.com
25
    Date:  August 18, 2014                    By:   */s/ George R. Morris*
26                                                  GEORGE R. MORRIS

27

28                                          12