Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

```
PETZILLA, INC. a Delaware        )
Corporation, d/b/a Petzila,      )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )  No. C 14-1354 EMC
                                 )
ANSER INNOVATION LLC, a Minnesota)
limited liability company,       )
                                 )  San Francisco, California
          Defendant.             )  Thursday
_____)  August 28, 2014
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:　　　　　The Gikkas Law Firm
　　　　　　　　　　　　　530 Lytton Avenue, 2nd Floor
　　　　　　　　　　　　　Palo Alto, California 94301
　　　　　　　　　**By: Nicolas Spiros Gikkas, Esquire**

**For Defendant**:　　　　　King & Spalding LLP
　　　　　　　　　　　　　601 South California Street
　　　　　　　　　　　　　Palo Alto, California 94304
　　　　　　　　　**By: George R. Morris, Esquire**

　　　　　　　　　　　　　Fredrikson Byron, P.A.
　　　　　　　　　　　　　200 South Sixth Street, Suite 4000
　　　　　　　　　　　　　Minneapolis, Minnesota 55402-1425
　　　　　　　　　**By: Grant D. Fairbairn, Esquire**

**Reported By**:　　　　*Katherine Powell Sullivan, CSR #5812*
　　　　　　　　　　*Official Reporter - U.S. District Court*

*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

**P R O C E E D I N G S**

**AUGUST 28, 2014**                                    **3:37 P.M.**

**THE CLERK:**  Calling civil case No. 14-1354, Petzilla, Inc., versus Anser Innovation LLC.

Counsel, please come forward and state your appearances for the record.

**MR. MORRIS:**  Good afternoon, Your Honor.  I'm George Morris from the law firm of King & Spalding.

**THE COURT:**  All right.

**MR. MORRIS:**  I am counsel for Anser Innovation LLC.  I would like to introduce my colleague, Greg Fairbairn.  He is from Minnesota, pro hac.

**THE COURT:**  Welcome.

**MR. MORRIS:**  And he will be actually handling the motion.

**THE COURT:**  All right.  Welcome, Mr. Fairbairn.

**MR. GIKKAS:**  Good afternoon, Your Honor. Nicolas Gikkas for the plaintiff, Petzilla, Inc.

**THE COURT:**  Thank you, Mr. Gikkas.

First thing I want to do is, sort of, clarify the sealing matter.  We did put this matter last because I know that there's been some citation to aspects of the Tuffy license. And I want to be -- I don't want to breach something here.

On the other hand, you know, obviously the agreement and some of the terms are very relevant to, I think, the analysis

here.

And, I guess, my question is, what is it that the parties are particularly concerned with in terms of sealing?  I mean, obviously, economic terms and that sort of thing, but the things that we're likely to talk about in terms of respective responsibilities, roles, et cetera, is that also of such sensitive concern that it needs to be under seal?  What's the --

**MR. FAIRBAIRN:**  Your Honor, I can address that for Anser.

**THE COURT:**  Yeah.

**MR. FAIRBAIRN:**  It's Anser's document.

**THE COURT:**  Right.

**MR. FAIRBAIRN:**  Really, the concern, big picture, is these are direct competitors.  Petzilla and Anser are both pre-revenue, both going into the market at the same time.

Anser has a commercial agreement with Tuffy's Pet Food. They're concerned about, you know, things like the royalty rate being set out, things getting into the hands of their competitor.

So part of this was designating this confidential so that Petzilla wouldn't just get a copy of the commercial agreement. And then that, of course, necessitates filing it under seal because it's confidential as to Petzilla.  It defeats the confidentiality for it then to go onto Pacer and flow down.

So I think you're right that, in general, the terms that we're going to discuss today are not the type that would require sealing a transcript or anything like that.  I think we will be okay as long as we stay away from talking about specific numbers that are contained within the agreement.

**THE COURT:**  Well, I think what I'd like to do is not put this hearing under seal.  But if things come up that you think should be under seal, somehow something comes out, that, you know, you could ask for some portions to be sealed.

And, likewise, I don't know what -- I can't even remember what's been filed, but generally our rule under 79-5 here is that the presumption is things are public unless you meet the standard.

So to the extent, you know, there's been a sealing of an entire exhibit, that's probably not appropriate.  You should probably go back and redact and file a redacted version with those things that truly are proprietary or sensitive or trade secrets.  And, you know, refile that.

So we'll just proceed and if somehow there's been some discussion, or if I say something I'm not supposed to say, you'll let me know.  All right?

**MR. FAIRBAIRN:**  Okay.

**THE COURT:**  So I'm going to leave it to you to ask for anything in this transcript to be sealed, if something sensitive comes out, and make sure that whatever is on file

with the Court, there should be a redacted version that's unsealed, compliant with Rule 79-5.

**MR. FAIRBAIRN:**  Sounds good.  Thank you, Your Honor.

**THE COURT:**  All right.  Okay.  So here we are about a motion to dismiss.  And I will say one thing.  Originally, this case was filed and you drew Judge Davila.

**MR. FAIRBAIRN:**  That's right.

**THE COURT:**  And although it was voluntarily dismissed, under our local rules there should have been a motion -- notice of related case.  Even though he apparently didn't do anything in the case, it is still, nonetheless, related, I think, in our normal rules, at least give notice of related cases, and then Judge Davila would have the option to determine whether or not he would relate the case.  And so that wasn't done.

And although I could say, well, I think we ought to go back and do that procedure, given how much time I've spent and you've spent in this case, we're going to go forward.  But I think, for future reference, there is a reason why we do that.

And part of it -- I'm not accusing anybody of forum shopping -- is we do want to make sure that there isn't, kind of, forum shopping or any kind of incentive, as well as there are judicial economies involved to the extent that a judge may have, unbeknownst to you, looked at the complaint and done things and that sort of thing.

So that being said, I'm prepared to go forward in any

event.  So we're here on the motion to dismiss for lack of personal jurisdiction.  There's not a claim of general jurisdiction, which is particularly hard now in light of some of the Supreme Court precedent.  But it's specific jurisdiction.

And I think it's not disputed that in the arena of declaratory relief actions in patent cases, the key is you look at whether the claim arises out of or relates to the activities of the patentee in enforcing the patent or patents-in-suit in the jurisdiction.

So even if there's commercialization efforts, some things are sold, there are other things, that generally is not enough. I guess, perhaps at some point the volume is so great maybe, but generally my understanding is that you look at the patent enforcement activities in the forum.

So if there's been lots of patent infringement suits brought, et cetera, that's one thing.  One manifestation of that is exclusive licensing agreements that impose enforcement obligations on the patentee or the licensee that, sort of, reflect that enforcement activity.

And here I think it's clear that the cease and desist letter alone is not enough.  I don't think either of you are contending that's the case.  The law is pretty clear that that is not enough.  The *Silent Drive* case out of the Federal Circuit, I think, makes that evident.

So the key is this Tuffy's agreement and whether or not it is analogous to, kind of, an exclusive licensing agreement that then confers or obliges patent enforcement activity such as to warrant the exercise of specific jurisdiction here.

And I've looked at this and, you know, my understanding of the agreement is that, really, it focuses on the development of the Treat Pack, the food thing that goes with, I guess, the PetChatz device.

But in looking at the agreement I didn't see a whole lot -- there's certainly no conferral of -- I didn't see any sort of patent ownership interest or any licensing per se of the patent rights.

There are marketing agreements.  There are various things that go on here that, you know, contemplate -- I won't call it a joint venture, but it kind of feels like a joint marketing deal and an arrangement to, kind of, couple up the treat thing with the actual dispenser.

But I don't see anything here that looks like an exclusive patent license agreement, particularly one which then delegates or obliges patent infringement enforcement activity.

So if there's something I've missed, I certainly would like to have -- I have the agreement here.  It's a long agreement but -- so that's my tentative view, that this doesn't meet the standards that's required to find specific personal jurisdiction, because it's not close enough to an exclusive

license with enforcement obligations and delegations.

**MR. GIKKAS:**  I guess that question is to me, Your Honor.  I'd be happy to address it.

**THE COURT:**  Sure.

**MR. GIKKAS:**  The standard -- the relevant standard that we believe is applicable in this case is the one we cited in the brief.  And that's the -- from *Cor-Vent* -- *Genetic Implant Systems versus Cor-Vent*.

And that basically sets forth the following:

"The appointment of a distributor to sell a product covered by a patent is analogous to a grant of a patent license.  Such an action conveys an implied license to the distributor, thereby surrendering the patentee's right to exclude the distributor under the patent."

Then it cites Section 154(a) 35 U.S. Code.

What has happened here in this particular agreement is the grant to Tuffy's -- which is the pet food manufacturer and also a retailer -- of an exclusive right to manufacture the pet food products.

Also, perhaps more importantly, Tuffy gets an exclusive right to sell the Treat Packs to distributors, brokers, retailers, and end users.  That's in Section 5.1 of the agreement.

There is a carve-out for Anser for Internet sales to end users.  However, I believe it's in dispute that Tuffy's has an

exclusive right to distribute the Treat Packs.

THE COURT:  Packs but not the -- the actual dispenser.

MR. GIKKAS:  As far as I can tell, they don't manufacture any of the product.

However, the Treat Packs are worthless without the food inside them.  And, therefore, they also make the food and the pack itself.

THE COURT:  Well, but you can have other foods.  I mean, couldn't PetChatz use other food packs?  Does it have to be -- I mean, mechanically, why couldn't somebody else provide that?

MR. GIKKAS:  That's a good question.  And if I may, I'd like to introduce into evidence something I just found on the Internet yesterday, in fact.

May I do that, Your Honor?

THE COURT:  Well, have you shown it to counsel?

MR. GIKKAS:  I haven't shown it to counsel.  It's from their website actually.

THE COURT:  Well, all right.  I'll take a look at it after counsel has had a chance to ...

(Pause)

THE COURT:  Okay?

MR. FAIRBAIRN:  Sure.

MR. GIKKAS:  And I'd put into record the relevant portion.

**THE COURT:** All right.

**MR. GIKKAS:** How many copies does the Court need?

**THE COURT:** Well, two if you have two.

**MR. GIKKAS:** Two. There you go.

So the answer to your question is no, you can't just put any food in the PetChatz product. And according to their website, there's a question on a Frequently Asked Questions page, says, Can I use other treat --

"Can I use other treats inside PetChatz?"

The answer is:

"The treats for PetChatz have a unique shape, size, and are made from proprietary recipes specifically designed for use in the PetChatz system. Using any other treat would clog the system or cause other damage," and, in parentheses, says "and void the one-year limited warranty."

So these aren't just generic food items that you can just put --

**THE COURT:** But the food item is not what's patented. It's PetChatz.

**MR. GIKKAS:** Well, under the -- under the Federal Circuit, we just have to assert that a patent covers the product. Okay.

So the PetChatz product --

**THE COURT:** What do you mean "the patent covers the

product"?  For what purpose?

MR. GIKKAS:  Excuse me, that the -- excuse me.  That the distributor is practicing the -- you know, some aspect of the patent.  In fact, we believe -- we contend that Tuffy's is.  In fact, it's covering Claim 11 of the '152 patent.

And to be precise, we're talking about patent number 7,878,152.  And on Claim 11, it's a method claim.  The '152 patent is a method patent.  And in Claim 11 what's claimed is dispensing food to the animal.

So there's a -- there's a claim where dispensing food of the animal -- to the animal is, according to Anser, part of its intellectual property.

THE COURT:  Well, but it doesn't describe any aspects of the actual food.

MR. GIKKAS:  It does not.  However, the -- the mere act, because it's a method claim, the step of dispensing the food is, in fact, a part of that patent.

THE COURT:  So your argument is that Tuffy is, therefore, practicing the patent and is, therefore, like an exclusive licensee because they're the only one that can practice this --

MR. GIKKAS:  The only one that can practice this claim.  The only one allowed to practice this claim.

And as part of the -- as part of the --

THE COURT:  Does this agreement prevent Anser from

contracting with another food manufacturer who could make the same shape and the different packet and use different flavors?

Is there something that ways we will not give anybody else an opportunity to provide these food packs?

**MR. GIKKAS:** Well, my understanding of contract law, Your Honor, is when a contracting party grants another party an exclusive right, that that eliminates the possibility that anyone else can do this.

Now, in all fairness, it is for a two-year term. It's not a perpetual license. It's for a two-year term. I assume it can be renewed.

But it is an exclusive license to -- and they have exclusive rights to sell the Treat Packs to distributors, brokers, retailers --

**THE COURT:** Well, to sell Treat Packs, yes.

**MR. GIKKAS:** Yes.

**THE COURT:** But what about analogous treat packs? Is there something in here that would prevent Anser from going to a Tuffy competitor and saying, you know, they've got, 20 different Treat Packs, but we want something that's more tropical, or something, or more nutritious, more organic things; it's got to be shaped the same way in order to fit, but we want you to do it.

Is there anything that prevents them from going to another and having other treat packs?

**MR. GIKKAS:** I don't quite follow your question, Your Honor.

My reading of this contract is Anser enters into a contract with Tuffy's to make all their Treat Packs and to provide all that -- manufacture all the food for the Treat Packs. To the extent that there's some other evidence that shows that they're doing something else with somebody else, I haven't seen it.

And because I'm looking at this from the standpoint of Federal Circuit case law in that, you know, did Anser give Tuffy's an exclusive distributor agreement? And they have.

And does the distributor agreement relate to a product which is covered under the patent-in-suit? This is a DJ patent case. All we're looking for here, as I understand the case law, is fairness and due process. Is it fair to bring Answer into this jurisdiction, into this forum, because it's made this agreement?

The other issues that are -- that support our position is that Tuffy's is not only the exclusive distributor of this, but there are at least 26 retail stores in California that have been contacted by Anser, seven in this very district.

The combination of that, we believe, would give Anser the expectation, yes, they could be brought in a DJ case here in this --

**THE COURT:** Well, but their commercialization has been

held not -- generally not enough because it doesn't arise -- cause of action doesn't arise from that.  It's got to arise out of the enforcement activity of the patent, not the commercialization activity.

MR. GIKKAS:  Yes.

THE COURT:  The fact that they've now sold at 18 retailers, or however many retailers, I'm not sure that's -- that's not the inquiry here.

MR. GIKKAS:  No, it's not the inquiry.  But in *Cor-Vent*, an out-of-state distributor who has agents in the state and who's directing activities in the state can be subject to the personal jurisdiction of this forum.

And I make that point to say that because Tuffy's, which is a Minnesota corporation, an out-of-state company, it has 400 -- at least 400 retail outlets, at least 26 in this state.

So the agents are here.  It can't say, oh, I'm sorry, I'm a Minnesota company and I shouldn't be brought -- you know, I have no contacts.

As long as the distributor -- as long as Anser is making a contract -- exclusive distribution agreements with distributors that have outlets in this state, then Anser has opened itself up to be a DJ defendant in a patent case under the Federal Circuit case law.

THE COURT:  In terms of the enforcement of the patent obligations, what is there here that -- that confers or obliges

patent enforcement arising in this agreement?  Is there anything?

**MR. GIKKAS:**  Well, as I understand the case law, Your Honor, there's nothing that the agreement has to have expressly obliging it to enforce any particular patent.

**THE COURT:**  Well, it certainly is one relevant factor.

**MR. GIKKAS:**  It is a relevant factor.  In fact, if we had that, you know, we would be golden.

**THE COURT:**  All right.  So there's nothing in here about that?

**MR. GIKKAS:**  There's nothing that explicitly/expressly sets forth, you know, Tuffy's has the right to enforce the '152 patent or anything along those lines.

However, the case law indicates that as long as you have a distributor selling a product covered by patent, it's analogous to the grant of a patent license.  The Federal Circuit has said it's analogous to the grant of a patent license.

And the action conveys an implied license, thereby surrendering a part of the bundle of rights in the patent.

We're contending that Claim 11 of the '152 is, in fact, one of the bundle of rights that Anser has given away.  It's given it away to Tuffy's.  And Tuffy's --

**THE COURT:**  Well, all they've given away at most, it seems to me, is the right to produce these Treat Packs, which are not -- it's not clear to me that that's part of the patent

itself that is used.

I guess you would make an argument that this is some form of contributory --

**MR. GIKKAS:**  Contributory inducement of infringement.

**THE COURT:**  But that's not infringement -- I mean, that's not the patent itself.  Just because they may be found to be contributory, that doesn't mean that it's part of the patent.

**MR. GIKKAS:**  The case law -- there's no case law that says that the distributor has to be directly -- the direct infringer in its own right.  As long as some bundle of right is used, we're understanding that -- that Tuffy's falls -- falls into this category.

**THE COURT:**  You mean as a jurisdictional basis.

**MR. GIKKAS:**  For jurisdictional purposes, right.  This is -- where we are at this stage, where, you know, the defendant hasn't answered the complaint but is moving to dismiss this case based on -- based on lack of personal jurisdiction, you know, the -- the Federal Circuit has given us this guidance in terms of how to treat the situation.

And in this situation, we believe we have good grounds to say that they do belong in this jurisdiction under -- under *Cor-Vent*.

**THE COURT:**  Isn't there a difference in *Cor-Vent*? There the patentee agreed not to appoint any other person,

firm, or entity to sell or otherwise distribute the products, which includes the dental implants covered by the patent-in-suit.

So here if -- if Tuffy were a distributor of the PetChatz itself and there was an agreement we're not going to give anybody else the right to distribute this, I could see that. But here they don't even sell the device -- they sell the device, but not an exclusive right to sell the device.  The only exclusive right they have is the food.

**MR. GIKKAS:**  Which is a critical component of the device, I have to say.

**THE COURT:**  Well, I guess that's the question.

**MR. GIKKAS:**  Without the food, the Pavlovian response of the animal is not going to happen.

**THE COURT:**  Right.

**MR. GIKKAS:**  I mean, the animal is not going to come --

**THE COURT:**  I don't know.  Isn't the idea you see the master's face and voice, you hope -- hopefully, it's not the food.  Otherwise, that's not a very loyal dog or pet.

(Laughter)

**MR. GIKKAS:**  That's going outside my expertise here, Your Honor.  But I would say that the food is -- is a key part of the product, if not -- and as the information I just showed the Court shows, it's -- it's a part that you have to use to

run it.  You can't substitute anything else for it.

THE COURT:  All right.  So that's the question.  Let me ask your opponent then.

That's the question.  There's no dispute that Tuffy doesn't have exclusive rights to sell PetChatz.  But they have exclusive right to sell something that's indispensable and inextricably intertwined and designed exclusively for this.

Why shouldn't that be enough?  It's like a distributorship.

MR. FAIRBAIRN:  Sure.  Because it's not an exclusive right to sell any food for use in the PetChatz product.

If you read Section 5.1D, which is the exclusivity clause, what it says is that Tuffy's will have the exclusive right to manufacture the pet food products for inclusion in the Treat Packs.  Capital T, capital P.  "Treat Packs" is a defined term.

If you go back earlier in the agreement, back to the beginning, they define Treat Packs as the pack that Anser and Tuffy are codeveloping.

THE COURT:  Where is that?  I was trying to find where Treat Pack -- first time see I see it capitalized is 1.2E.

MR. FAIRBAIRN:  Correct.  "Primary responsibility for completing design for the Treat Pack, Treat Pack and Treat Pack dispenser for use in the device."

What that section, combined with 5.1D, says is that pack that we've developed together, you're the only one who can fill

that, and you're the only one who can sell that.  It doesn't say nobody else can make a treat that can fit in our dispenser.

And this language from the website doesn't say that either.  What it says is they're protecting partner.  Don't try to use other products in our device because it might break and you would void your warranty.

This one that we've developed with Tuffy's will work in our devices and you can feel free to use it.  That's not talking about patent rights.  That's talking about reality.  You try to jam a Milk Bone inside of a PetChatz, it might break it.

But what we've got to focus on here is what Chief Judge Giles Rich of the Federal Circuit called "the name of the game is the claim."

**THE COURT:**  Is the?

**MR. FAIRBAIRN:**  "Is the claim."

Patent rights are not defined in terms of key parts or essential elements or key components, which I understand why Petzilla wants to talk in that abstract way about what this patent covers.  Is it a Pavlovian response or so on.

We don't need to do that because we can look at the actual claims themself.  Claim 11, which talks about pet food, depends on Claim 8.  Claim 8 has 13 steps, none of which Tuffy's provides.

All of the independent claims in this patent -- Claim 1,

Claim 8, Claim 17 -- start off with a common phrase.  After they say it's a method for communicating with an animal, they say "providing a communication device."

And they go on to say what that device includes, a monitor -- or, I'm sorry, a screen, a pause switch, a microprocessor, so on.  That's the device.  You have to provide the device before you get to Claim 11 where you're providing food from that device.

Tuffy's doesn't have any exclusive right to sell the PetChatz device.  I think everybody agrees on that.  If you look at Section 2 of the commercialization agreement, you'll see why, because it specifically says that Anser retains all rights to sell the PetChatz product.  There's no possible way you could argue that Tuffy's has any exclusive rights to PetChatz.

Section 7.1A talks about licensing rights, or IP rights, and says specifically Anser is not giving Tuffy's any rights to its existing IP.  That's an explicit statement.  We are not giving you a license.

What we're really talking about here then, under the *Cor-Vent* case that counsel cited, is an implied exclusive license to practice the patent when we already have a statement that you're not getting rights to practice the patent.

I think you need to go to the actual claim itself and see does Tuffy's practice that claim?  Even in combination with

Anser does Tuffy's practice that claim?  Because if it doesn't, then it wouldn't have needed a license.

And that's the problem with -- the overarching problem with Petzilla's argument.  Anser doesn't practice claim.

**THE COURT:**  Even if they have the exclusive right to sell the Treat Packs, which are, in practical terms, indispensable to the operation of the patented device?

**MR. FAIRBAIRN:**  I would disagree that they are indispensable because the pet food dispension claim is one dependent claim out of 20.  Right?

Claim 1 doesn't have a dependent claim mentioning dispensing pet food.  Claim 17 has three dependent claims.  It doesn't mention dispensing pet food.  One dependent claim and one independent claim.

And this gets back to the problem of when you start talking about somebody licensing the key component of a patent, what does that mean?  You don't license key components.  You license claims.

Tuffy's is not licensed by Anser, under any reading of Federal Circuit law, to practice any claim of the '152 patent.

Claim 8 requires a paw switch.  Anser's PetChatz license, which everybody agrees is covered by Claim 1 of the patent, doesn't have a paw switch.  Anser doesn't practice Claim 11.

So it's illogical to say they would have granted an exclusive right to somebody else to practice Claim 11.  They

didn't need to.  I think maybe --

THE COURT:  So the only -- the PetChatz is practiced -- is practiced in only Claim 1.

MR. FAIRBAIRN:  Well, it may practice Claim 17 as well.  I haven't analyzed that.

THE COURT:  But not Claim 11.

MR. FAIRBAIRN:  But not Claim 11.

THE COURT:  So, theoretically, it might have a -- this might be a different argument had this device practiced Claim 11 and Tuffy's provided an integral part of that device?

MR. FAIRBAIRN:  I'm not sure it would matter even then, Your Honor.  It's sort of shorthand.  It kind of short-circuits the argument.  If Anser isn't practicing Claim 11, then why would we assume Tuffy's has to practice Claim 11 to use pet treats in the PetChatz product?

I think it's even simpler than that.  Take away the commercialization agreement.  Pretend it doesn't exist, because this is the agreement that supposedly gives the exclusive license.

If it doesn't exist and Tuffy's comes up with a pet Treat Pack, same design, same everything, everything works with the PetChatz product, all of that, the question really is:  Could it do that?  Could it make that product and sell it, use it, and manufacture it without a license to the '152 patent?  Because if it could, then it didn't need a license and we

shouldn't be reading an implied particularly an exclusive license in that scenario.

And the answer is absolutely yes. Tuffy's absolutely could have made a pet treat product that could have worked in the PetChatz device without needing the license to the '152 patent.

And that's also true, to get back to a question that you asked of other manufacturers. If you read Section 5.1 -- I'm sorry, I believe it was 5.1D, which is the exclusivity provision -- what you'll see is nothing there says that Anser is prevented from having a similar deal with another manufacturer to make pet treats that could fit in the PetChatz product.

What it says is it can't have another manufacturer fill the pet Treat Packs that it developed with Tuffy's. Those Treat Packs Tuffy's has the exclusive right to and has the right to make the food that goes into that package.

Imagine a bag of potato chips, and it's Lay's potato chips, and you have an exclusive agreement with Lay's that their package, only Lay's, can put potato chips in there. That's fine. But that doesn't mean that nobody else can make a bag of potato chips.

That's very similar to what we're dealing with here. And it all comes back to they need to tie the exclusivity not to a product, but to a product that is covered by a claim of a

patent.

THE COURT:   I'm trying to understand.   What exactly is this Treat Pack?

MR. FAIRBAIRN:   My understanding is that the Treat Pack contains treats.   You open the bag.   They take the treats out and put those in the machine.   The Treat Pack itself doesn't go in the machine.   The dog doesn't eat the Treat Pack. It's a container like a bag of potato chips.

THE COURT:   So it's just a container for the food?

MR. FAIRBAIRN:   Correct.

THE COURT:   So it, itself, does not go into the PetChatz?

MR. FAIRBAIRN:   That's right.   There's even a level removed from the PetChatz device.

But, at the end of the day, there's two things that Petzilla would need to prove to establish specific jurisdiction.

If they're not going to argue that there's an exclusive -- a written exclusive license agreement, which we haven't heard any argument about.   And they couldn't argue at this point because of 7.1A, which says it's not providing any rights to the IP.   Or they could argue that there's an exclusive agreement as to the PetChatz product, which they're not arguing because Section 2 specifically says that Anser is retaining all of those rights.

So what they've done instead is say there's another product, there's this third product, these pet treat packs for pet food that they have the exclusive right to make, and that's indispensable to the patent.

Well, if it's indispensable to the patent, it will be in a claim.  This is why I said the name of the game is the claim.  If it's not covered by a claim, then it's not indispensable to the patent.

So, in the end, Your Honor, we're down to one agreement that has some exclusive rights about a product that isn't covered by a patent.

Under any reading of *Cor-Vent* or, more recently, the *Autogenomics* case, that's not enough to give rise to specific jurisdiction because that doesn't relate to enforcement of this patent.

The pet Treat Packs may be covered by other IP.  There may be design patents that could be filed on the form of the pack.  But that's not the patent that's being attacked in this case.  And that's the patent we have to look at.

If Petzilla can't explain how Tuffy's practices any of the claims of the patent -- which it doesn't because it doesn't sell the device or doesn't provide a communication device, much less one with a paw switch -- then it didn't need an exclusive license to anything.  It could have made its product without ever having entered into an agreement with Anser.

**THE COURT:** All right. Response?

**MR. GIKKAS:** My response is simple, Your Honor. The case law does not require claim construction at this stage of the case. Doesn't require the parties to go into how the parts work, et cetera. It's looking at the patent.

The issue here is: Is it fair to bring Anser into this case? Has it somehow conveyed or went -- through a distributor agreement some aspect of the '152 patent which is at issue in this case?

By the way, in addition, it's also conveyed aspects of another patent, the '522, which we have not asserted, because it wasn't included in the cease and desist letter, but is a continuation of the same patent with apparatus claims.

The question here is not for the Court at this stage, before they've even answered the complaint, before there's been a claim construction of any kind to do this, to force the Court to do this at this stage.

All the Court has to look at, as a threshold matter, is does the Court believe that this agreement grants some aspect -- gives away some aspect of the patent to Tuffy's? We argue it does. We argue the method claims are very broad.

Dispensing food --

**THE COURT:** What do you mean as some aspect test? *Cor-Vent* says more than some aspect. It was an exclusive distributorship for the device that was covered.

I mean, you didn't have to go into trying to discern whether or not this is indispensable or not, there's a degree of indispensability.

Which, I agree with you, it seems inappropriate for the Court to have to slice and make that preliminary merits analysis at this early stage, which suggests that you should look at it kind of facially.

And that's what *Cor-Vent* is about.  You could tell facially, without going into claim construction, that the distributorship was the kind of exclusive distributorship that involved products that were covered by the patent-in-suit. Therefore, it carved out an area.  And whatever is implied by that is one thing.  But here you want to bootstrap in these food packs and say, well, it's indispensable to the patented device even though it's not facially covered by the claims --

**MR. GIKKAS:**  Your Honor --

**THE COURT:**  -- at issue.

So I have -- you're the one that's suggesting we make this inquiry.  That's the only way you get under the penumbra of *Cor-Vent*.

**MR. GIKKAS:**  There is no question that Tuffy's is the one making the food for this product.  Dispensing food to the animal is one of the elements -- is one of the steps in this patent.

The threshold inquiry here is:  Has Anser given away some

of its intellectual property to Tuffy's in terms of allowing them to use exclusively some aspect of it?

We know they haven't given them the patent, but they have exclusively provided to them the dispensing of the food for the product.

That's the only thing we're saying here.  And we think facially that is happening.

Whether it's getting into all these other claim construction issues we don't need to go there.  We shouldn't have to go there.  The case law doesn't require it.

I'm aware of no case where claim construction of any kind is done at this point in the game.  It's simply not happening.

It's just one example, by the way, of any activities, any activities that the patent holder is doing in the forum, which would allow him to be -- or her to be sued here.

We think we've made that case.  And the question is -- I mean, the exclusivity is in the agreement itself.  If the Court does not believe that Tuffy's has been granted an exclusive right to dispense these treats, these food products, then -- then that's something that the Court can determine.

But we believe that under this patent, under this method, they are at least contributing or inducing the infringement of some direct infringer.  And whether it's -- whether it's Anser or somebody else, we don't know.  But at least it's a right under the patent that has --

**THE COURT:**  Do you have a case that says doing business with an inducer or a contributor, unlike doing business in granting exclusive service distributorship to actually selling the product, is enough for specific personal jurisdiction?

**MR. GIKKAS:**  Couldn't find a case with this particular fact pattern.

But the general proposition of granting a distributorship which -- which Anser has clearly done -- that is covered by -- to a product which is covered by the patent, I think, is here.

I think that's the general understanding that I have of what allows a DJ defendant to be brought into a case.  Its own actions.  Its own activities.

**THE COURT:**  Well, but, the reason is because when you give an exclusive distributorship obligations kind of go with that.  You've got to obviously identify, you've got to protect the patent.

Usually it comes along with, you know, somebody has got to be obligated to enforce the patent once there's an exclusive distributorship.  You can't just let it sit there.

But when it's not an exclusive distributorship, you're just doing business with an inducer, it's not as obvious that inherent in that is some concomitant obligation to prosecute patent infringement cases.

**MR. GIKKAS:**  Well, there are other aspects to the

license which -- which appear to be parallel to a patent license.

For example, Tuffy's acknowledged that Anser owns the patents related to the device related to the Treat Pack.

Section 7.1A.  Tuffy's agrees not to dispute or challenge Anser's IP.

Section 7.1B(i)(ii).  Tuffy's acknowledges that Anser owns the patents relating to the device and relating to the Treat Pack and Treat Pack dispenser.

Section 7.31.  Anser grants Tuffy's a license to Anser's trademarks.

Sections 9.1.  Anser indemnifies Tuffy's for any third-party claim or demand related to the IP rights.

**THE COURT:**  Well, see, that's a non-exclusive, limited license during the terms of the use of the trademark and copyrights.  It's not exclusive.  That's an example of non-exclusive.

**MR. GIKKAS:**  I'm just saying that these are aspects of the license, which take it outside of the purview of -- outside of the confines, okay, is this simply a marketing deal where I'm just going to have you manufacture some food for a couple of years.  There's much more to this agreement than that.

And including, I think, the most important issue which is they're the only ones that can make the -- the food for this particular product.

**THE COURT:** Well, I'm not sure about that.  I mean, somebody else -- I don't see anything that prohibits somebody from coming up with something other than a Treat Pack that's -- that, you know, packaged in a different way, that could still fit.

I mean, what is this dispenser?  Is there something unique about this dispenser?  What's special about this dispenser?

**MR. GIKKAS:** We've had no discovery on the product, Your Honor.  We don't -- we don't know.

All we know is that Anser is telling its consumers, its customers, don't use anything in this product other than the Tuffy's products because you're going to break the device and void your warranty.

**THE COURT:** One could be cynical and say, I know why that's in there.

Not saying there's an antitrust agreement here, but, you know, it's a little hard to believe you put a couple of raisins or cookie crumbs and that's going to clog up the machine.

But I don't know.

**MR. GIKKAS:** There's --

**THE COURT:** I read the patent.  I don't see anything described that's unique about the dispenser that requires only one variant or one manifestation or embodiment of the food. There's nothing in here that suggests that in this patent.

**MR. GIKKAS:** Other than the agreement itself, which

grants them the exclusive right to make --

THE COURT: For the Treat Packs.

MR. GIKKAS: And to manufacture the food.

THE COURT: For the Treat Packs.

MR. GIKKAS: Correct.

THE COURT: Yeah.

All right. Well, you can hear from my skepticism my view that there is no general personal jurisdiction. And I don't think there's specific personal jurisdiction here.

I think the requirement that there be an indication of patent enforcement activity or defense of the patent, validity of the patent, that kind of thing here, is not found in the Tuffy agreement.

I find that it is not like an exclusive licensing agreement as in *Cor-Vent*. An exclusive licensing agreement, I think, either usually has an explicit, if not implied, obligation to then protect that agreement by either the patentee or assigning to the licensee the obligation to prosecute and make sure that the -- the intellectual property rights are protected.

Whereas, here, at most -- and I'm not even sure it constitutes this -- there's an exclusive right given to somebody who might be deemed an inducer or contributor. And I think it's not even that category.

But I'm not aware of any cases that say doing business

with an inducer or contributor, even doing exclusive business with somebody like that, carries with it the same kind of obligations with respect to enforcement of patent rights that would be sufficient to confer personal specific jurisdiction.

But, I think that, here there's not even -- I don't think that Tuffy constitutes an inducer or contributor because there's nothing that suggests to me, based on the patent or anything else that I see, that other food packs or food embodiments can't be used -- even though its discouraged in its marketing activity -- why that can't be used with PetChatz.

And so, in any event, this is not like the exclusive license in *Cor-Vent*.  Here there is no exclusive rights over the PetChatz product itself.  And the agreement makes clear that there has been no conferral of any IP rights in the patent; that it's all retained by the patentee, the patent holder.

And there is nothing in here that talks about any obligations or delegation of enforcement activities with respect to third-party infringement of the patents.

So it's not the kind of enforcement and defense of validity activity that the Courts have found necessary to occur in the forum to support personal jurisdiction.  Therefore, I find that personal jurisdiction does not exist.

And I assume that there's not a motion to remand this somewhere.  The case will have to be dismissed.

So I'll get out a short order memorializing the high points of this, but that is my ruling.

MR. FAIRBAIRN:  Thank you, Your Honor.

MR. GIKKAS:  Thank you, Your Honor.

THE COURT:  Appreciate your argument.  Thank you.


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, October 9, 2014

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter